1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br>     vs.<br><br>RONALD SAATHOFF et al.,<br><br>                          Defendants. | CASE NO. 06cr43-BEN<br><br>**ORDER**<br>**GRANTING DEFENDANTS'**<br>**MOTIONS TO DISMISS THE**<br>**SUPERCEDING INDICTMENT** |

Now before the Court are several motions to dismiss the superceding indictment and motions for joinder. [Dkt. nos. 467, 468, 471, 473, 474, 475, 481, 484, 486, and 487.]  For the reasons that follow, the motions are GRANTED and the case dismissed against each of the five defendants.

## I.  INTRODUCTION

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926) (citation omitted).

The genesis of this case is a bad financial plan devised by the San Diego City Council, reviewed by the City Attorney, approved by the City Manager and proposed to the board of trustees of the San Diego City Employees Retirement System ("SDCERS").

The federal crime charged against these defendants is a model of vagueness.  It says, "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Title 18 U.S.C. § 1346.  That public

1    officials are to perform their public services honestly, is a reasonable, if not obvious, legal

2    requirement.  But without more precision and definition, the commandment that public officials

3    refrain from depriving another of honest services is undeniably vague.  So much so that courts

4    constantly struggle to define what constitutes "dishonest services."  It is worthy of note that the

5    United States Supreme Court is presently evaluating the statute in three different appeals.[1]  But

6    statutes should not be written so as to be understood by judges, legislators, lawyers, and law

7    professors, but for the citizens against whom they may one day be applied.  Thus, the question

8    here is whether a reasonable person in the position of these defendants would have known that by

9    doing what he was being asked to do would violate the federal honest services statute?

10        The defendants are city government employees.  Three are city employees who were also

11   members of the city's pension fund board of directors.  The other two defendants held positions as

12   administrator and general counsel for the city pension fund.  The defendants, along with other

13   board members, approved a proposal dreamed up by the city council of the City of San Diego.

14   The proposal came to be known as "MP2" or "manager's proposal 2."  The city manager's office

15   fashioned the scheme because with the value of the pension fund sinking, the city would have to

16   pay millions of dollars into the pension fund while struggling under an already cash-strapped city

17   budget.  So, the city looked for a way to avoid immediately replenishing the pension fund.  It

18   decided to do what it had done before.  "Manager's Proposal 1" had been used in 1996 to lower

19   the trigger point for replenishing the pension fund.  MP2 proposed to lower the trigger point

20   further.  A lower trigger point would give the city much needed time in the hopes that future years

21   would bring healthier budgets  Of course, a lower trigger point would also mean a higher risk of

22   pension fund insolvency.

23        To make MP2 more attractive to the pension fund board, the city also offered an increase in

24   future pension benefits for city employees.  The pension benefit increases were conditioned upon

25   the pension fund board approval of MP2.  The whole package was then pitched to the pension fund

26   board.  In hindsight, it was a bad fiscal idea.  Although the indictment alleges MP2 was the

27   _____

28        [1]The Supreme Court has granted *certiorari* in three honest services fraud cases this court term
     to address the application of the statute.  *See Skilling v. United States*, 130 S. Ct. 393 (2009);
     *Weyhrauch v. United States*, 129 S. Ct. 2863 (2009); *Black v. United States*, 129 S. Ct. 2379 (2009).

defendants' idea, if it was a bad idea, it was the city's bad idea first.

Here, while the effect of a bad decision might be the impetus for prosecuting, it is the manner of making the bad decision that federal prosecutors find criminal. In this case, the defendants are accused of scheming to deliver dishonest municipal government services, by failing to disclose conflicts of interest, while voting as pension fund board members on MP2. In other words, it is not the voting which prosecutors find criminal. Nor is it the substance of the proposal which prosecutors find criminal. It is the failure to disclose some alleged conflict of interest which prosecutors find criminal.

To be clear, when our public officials misuse their positions for pure self-enrichment or to flout the law, they deserve to be prosecuted. However, these defendants are not being charged with accepting a secret bribe, or taking an under-the-table kickback, or extortion, or directing a city contract to a family-run business. Nothing of that sort. The allegedly dishonest services have to do with voting to approve a city proposal which would lead to enhanced retirement benefits for city employees. The retirement benefit enhancements would, in turn, also improve the defendants' own city retirement benefits, since the defendants are city employees (*i.e.*, the conflict of interest).

Failing to disclose a material conflict of interest has been held to be a violation of the honest services statute. *United States v. Kincaid-Chauncey*, 556 F.3d 923, 942 (9th Cir. 2009) (county commissioner failed to disclose she was receiving secret payments of $3,800, $5,000, $5,000, and $4,000 from strip club operator while voting favorably on ordinances affecting club operations). Here, the conflict of interest was hardly undisclosed. Other members of the pension fund board knew it. The city council knew it, and therefore, the public knew it. Worse, the alleged conflict of interest, such as it is, was thrust upon these defendants by virtue of their positions on the city payroll and the city charter which controlled the makeup of the board. The actual text of the honest services fraud statute which defendants are accused of violating, mentions nothing about disclosures of conflicts, what qualifies as a conflict, or how to be sure a conflict is properly disclosed.[2]

---

[2]As Judge Berzon recently observed,
   The point is not to dwell on the minutia or merits of various conflict of interest regulations, but rather to illustrate that it is often not readily apparent whether a

1    For their part, the defendants are charged with violating Title 18 U.S.C. §§ 2, 371, 1341,

2    1343 and 1346.   For the most part, these are familiar and common crimes.   Section 1341 is the

3    federal mail fraud criminal statute.   Section 1343 is the familiar federal wire fraud criminal statute.

4    Section 371 is the federal criminal conspiracy statute while section 2 is the aiding and abetting

5    criminal statute.   The "honest services" statute (§ 1346), however, is not commonly charged and is

6    relatively unknown to the public at large.   The meaning and reach of § 1346 lies at the center of a

7    trifarium of cases currently pending before the United States Supreme Court.[3]

8    Section 1346 is invoked together with the mail[4] and wire[5] fraud statutes because it provides

9

10    problematic conflict of interest exists and therefore whether an official's failure to
      disclose such information should or should not give rise to criminal liability.  Without

11    reference to some external disclosure standard, § 1346 could well impose criminal
      liability on activity that offends some people's subjective sense of impermissible

12    private entanglement, but may appear to others not to involve any conflict of interest.
      Moreover, it is also unclear what mitigating steps an official might take that could

13    render the conflict sufficiently immaterial to avoid disclosure.
            Furthermore, resolving what constitutes an impermissible conflict of interest

14    does not solve all of the ambiguity presented by § 1346 prosecutions.  The fraud
      inheres not in the conflict itself, but in the failure to disclose it – "[a]n official's

15    intentional violation of the duty to disclose provides the requisite deceit."  But again,
      it is not self-evident what adequate disclosure means in any given case.  How should

16    disclosure be made?  To whom is disclosure owed?  Courts elaborating the conflict of
      interest theory of honest services fraud typically observe that employees owe duties

17    of disclosure to their employers, and, in the case of public officials, to the public.
      However, without more, observing that a duty of disclosure is owed does not

18    necessarily inform the conduct that would satisfy the disclosure requirement in any
      given case.  Is it sufficient that a public official note the conflict at the time of the

19    vote?  In advance?  Must the conflict be widely publicized, or will a notation in an
      obscure public record suffice?  Is disclosure always an adequate antidote, or is the

20    official's recusal necessary in some circumstances?
      *Kincaid-Chauncey*, 556 F.3d. at 948-49 (Berzon, J., concurring) (citations omitted).

21
22    [3]See note 1, *supra*.

      [4]Section 1341 describes *mail* fraud in the following terms:
23          Whoever, having devised or intending to devise any *scheme or artifice to*

24    *defraud*, or for obtaining money or property by means of false or fraudulent pretenses,
      representations, or promises, or to sell, dispose of, loan, exchange, alter, give away,

25    distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious
      coin, obligation, security, or other article, or anything represented to be or intimated

26    or held out to be such counterfeit or spurious article, for the purpose of executing such
      scheme or artifice or attempting so to do, places in any post office or authorized

27    depository for mail matter, any matter or thing whatever to be sent or delivered by the
      Postal Service, or deposits or causes to be deposited any matter or thing whatever to

28    be sent or delivered by any private or commercial interstate carrier, or takes or receives
      therefrom, any such matter or thing, or knowingly causes to be delivered by mail or
      such carrier according to the direction thereon, or at the place at which it is directed

further definition for the phrase "scheme or artifice to defraud," as used in those sections.  Section 1346 defines the phrase "scheme or artifice to defraud" to include a deprivation of the intangible right of honest services.  Specifically, § 1346 provides:

> For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

Title 18 U.S.C. § 1346.

In its brevity lies ambiguity.  In its ambiguity lies the potential for well meaning public officials to run afoul of the statute.  As Justice Scalia aptly observed,

> Though it consists of only 28 words, the statute has been invoked to impose criminal penalties upon *a staggeringly broad swath of behavior*, including misconduct not only by public officials and employees but also by private employees and corporate fiduciaries.

*Sorich v. U.S.*, 129 S. Ct. 1308, 1309 (2009) (Scalia, J., dissenting from denial of *certiorari*) (emphasis added).  Moreover, the potential breadth of the undefined honest services provision leaves open the potential for *ad hoc* and after-the-fact definitions of crime which do not give fair notice or guidance to citizens employed in government service.  This is especially true for the conflict of interest-type prosecutions.  As Judge Berzon points out,

> ...ascertaining what constitutes a conflict of interest – or whether a particular interest is sufficiently material to warrant disclosure – is not necessarily a self-evident determination.  ...Without a reference to external disclosure standards, the conflict of interest theory of honest services fraud risks imposing a dangerously amorphous standard of criminal liability.  Courts have long been concerned that the mail fraud statute's potentially broad scope could give insufficient notice of criminal liability and lead to the creation of federal common law crimes. *The stakes are considerably higher in the case of public officials.*

*Kincaid-Chauncey*, 556 F.3d. at 947, 950 (Berzon, J., concurring) (citations omitted) (emphasis added).  It is the meaning and reach of § 1346 that lies at the center of this criminal prosecution

---

to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.
Title 18 U.S.C. § 1341 (emphasis added).

[5]Section 1343 describes *wire* fraud in similar terms:
Whoever, having devised or intending to devise any *scheme or artifice to defraud*, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.
Title 18 U.S.C. § 1343 (emphasis added).

1  and it is its ambiguity that impels defendants' motions to dismiss.  It is its vagueness as applied to

2  these defendants which compels dismissal of the indictment.

3                    **II.  HISTORICAL BACKGROUND**

4          The historical context of the underfunding of the City of San Diego pension fund is

5  described in *San Diego Police Officers' Association v. San Diego City Employees' Retirement*

6  *System*:

7          Pursuant to the San Diego City Charter, the San Diego City Council is
8  empowered to set benefits and establish a retirement plan for its employees.  That
   City Charter vests the Board of the Retirement System ("Board") with the power to
9  determine eligibility for receipt of retirement benefits under the system, which
   establishes a defined benefit pension plan.  In that role the Board administers the
10 retirement system and performs various functions related to the plan, including the
   calculation of annual employer and employee contributions, the management and
11 investment of the plan's funds and the distribution of pension benefits to retired
   City employees.  Membership in the Retirement System is compulsory and a
12 condition of employment for City employees.  Retirement benefits under the plan
   are funded by contributions from both the pension system's members and City,
13 which contributions are in turn invested for the benefit of the Retirement System
   members.  Before 1996 City's annual contribution to the Retirement System was
14 determined by a Retirement System actuary, who set the contribution rate based on
   actuarial calculations.  In its collective bargaining agreement City agreed to
15 subsidize or "pick up" a portion of the employee contribution, in addition to making
   its employer contribution.  Determination of the Retirement System's funded ratio
16 is based upon the current value of the system's assets compared to its future
   liabilities as calculated by the actuary – any difference between the two constitutes
   the "unfunded accrued actuarial liability."

17

18         In 1996 the Board and City Council approved an Employer Contribution
   Rate Stabilization Plan, known as "MP1," that changed the way in which City's
19 employer contributions were calculated.  According to the terms of MP1, City's
   annual contribution to the Retirement System was set at an agreed-upon rate that
20 was lower than its actuarially determined contribution rate.  In the event the
   Retirement System's funded ratio fell below a 82.3% "trigger percentage," MP1
21 required City's contribution rate to be "increased on July 1 of the year following the
   date of the actuarial valuation in which the shortfall in funded ratio is calculated ...
22 to restore a funded ratio" back to the 82.3% trigger level.

23         As a result of declining financial conditions and losses to the Retirement
   System fund in 2001, the system's funded ratio dropped and began to approach the
24 82.3% trigger percentage.  To avoid having to pay the full amount to restore the
   funded ratio to the trigger level by the following year, City sought relief from its
25 contribution obligations as part of the 2002 labor negotiations between City and
   Association.  It sought to condition any increase in benefits and compensation to
26 Association's members on the Board's approval of a proposal easing City's
   contribution burden under MP1.  That new proposal, aptly named MP2, retained the
27 82.3% trigger percentage but extended City's fixed contribution rate for another
   five years, during which time City would increase its payment 1% per year.
28 Despite opposition from Association's representative on the Board, MP2 was
   approved by the Board on November 15, 2002, and three days later City Council
   adopted an ordinance specifying that City's contributions were to be made at the

1    agreed-upon rate.

2    568 F.3d 725, 730-31 (9th Cir. 2009).

3         While established by the City, the pension fund board is a separate entity.  *Lexin v.*

4    *Superior Court of San Diego*, 47 Cal. 4th 1050, 1063 (2010).  During the time relevant to the

5    indictment, the composition of the board was fixed by the city charter.  In 2002, article IX, section

6    144 of the City Charter required that the board consist of 13 members.  Three members were by

7    designation *ex officio* positions for the City manager, the City treasurer, and the City auditor.  *Id.*

8    at 1064.  Three positions were designated to represent the fire safety members, the police

9    members, and the retired employees.  *Id.*  Three more positions were to be elected from the

10   pension fund's active membership.  *Id.*  The remaining four board members were drawn from the

11   community and appointed by the City council.  *Id.*  By design, then, the majority of the board

12   members had a personal stake in the health of the pension fund and the city.

13        This is an example of an "interested model of decisionmaking."  *Id.* at 1096.  In this model,

14   the board is composed of a "blend of individuals, each with a clear stake in many decisions,"

15   founded on a "belief that through the representation of all stakeholders, fair and wise decisions

16   will again emerge."  *Id.*  The city and state could have chosen to create pension fund boards

17   according to the "disinterested model of decisionmaking."  In that form, competence is sought

18   "through a decisional body composed entirely of individuals cleansed of any direct stake in the

19   outcome."  *Id.*  In California, "the Legislature *intended* for retirement board trustees to share

20   interests with their memberships."  *Id.* (emphasis in original).  Defendants Lexin and Webster, by

21   virtue of their jobs with the city, were *ex officio* board members designees, while Saathoff

22   represented the city's fire safety members.

23        The city union president's leave benefit which Saathoff eventually received is mentioned

24   repeatedly in the indictment.  The California Supreme Court described what it is and how it came

25   to be, as follows:

26            [In early 2002,] negotiations with the Firefighters and its president and lead
             negotiator, defendant Ronald Saathoff, involved a unique issue.  Union presidents
27           received a salary from the City and were also paid by the unions for serving as their
             presidents.  Beginning in approximately 1989, the POA [Police Officers
28           Association] president began contributing to his pension based on both the
             president's salary paid him by his union and his salary as a police officer, in

                                          - 7 -                                      06cr43

exchange for having his pension calculated based on his combined salary.  In 1997, the MEA [Municipal Employees Association] president secured the same right.
        During the 2002 negotiations, Saathoff sought the same treatment. ...Ultimately, the city council...decided to provide equivalent rights to the union presidents of POA, MEA, and Firefighters.
        ...On October 21, ...the city council...enacted the incumbent union president benefit without any reference to contingencies or action by the [pension fund] board.

*Lexin v. Superior Court*, 47 Cal. 4th at 1066-69.

### III.  LEGAL STANDARDS FOR A MOTION TO DISMISS

Against this backdrop, the Defendants move to dismiss the superceding indictment arguing that the indictment lacks an essential element of the honest services crime or that the honest services statute is unconstitutionally vague, both facially and as applied to them.

Federal Rule of Criminal Procedure 12(b) allows consideration at the pretrial stage of any defense "which is capable of determination without the trial of the general issue." *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993).  "On a motion to dismiss an indictment for failure to state an offense, the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  An indictment should be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

The Supreme Court teaches that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. U.S.*, 418 U.S. 87, 117 (1974).  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Id.* (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)).  "'Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" *Id.* at 117-18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)).

06cr43

1    Echoing this approach, the Supreme Court has explained more recently, "[a]n indictment

2  must set forth each element of the crime that it charges." *Almendarez-Torres v. United States*, 523

3  U.S. 224, 228 (1998). "An indictment is sufficient if it contains 'the elements of the charged crime

4  in adequate detail to inform the defendant of the charge and to enable him to plead double

5  jeopardy.'" *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (citation omitted); *see also*

6  *United States v. Lazarenko*, 564 F.3d 1026, 1033 (9th Cir. 2009) (same). An indictment should be

7  read in its entirety and construed using common sense. *Awad,* 551 F.3d at 936; *Lazarenko*, 564

8  F.3d at 1033. "The test for sufficiency of the indictment is 'not whether it could have been framed

9  in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'"

10  *Awad*, 551 F.3d at 935 (citation omitted).

11    Defects in an indictment do not deprive the court of jurisdiction to adjudicate the case.

12  *United States v. Cotton*, 535 U.S. 625, 630 (2002). "'[T]he objection that the indictment does not

13  charge a crime against the United States goes only to the merits of the case.'" *Id.* at 631 (quoting

14  *Lamar v. United States*, 240 U.S. 60, 65 (1916) (Holmes, J.)).

15                            **IV.  THE INDICTMENT**[6]

16    "This case falls outside of the core of honest services fraud precedents." *United States v.*

17  *Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1997). In this case, the defendants are not accused of

18  offering or accepting a bribe. *E.g. United States v. Frega,* 933 F.Supp. 1536 (S.D. Cal. 1996)

19  (attorney giving financial gifts to judges with the intent of influencing or rewarding them in his

20  cases). The defendants are not accused of using the power of their public offices to extort benefits

21  for themselves. *E.g., Kincaid-Chauncey*, 556 F.3d 923 (county commissioner receiving four

22  $5,000 payments from strip club owner to vote on ordinance in favorable way). They are not

23  accused of voting in a way that benefitted an undisclosed side-business (*e.g., United States v.*

24  *Selby*, 557 F.3d 968 (9th Cir. 2009) (federal official awarding contracts that rewarded spouse with

25  sales commissions)), or with the expectation of receiving an undisclosed cash kickback. *E.g.,*

26  *United States v. Waymer*, 55 F.3d 564 (11th Cir. 1995) (school board member failed to disclose

27  _____

28    [6]Throughout this opinion, the Superceding Indictment (filed October 14, 2008) is referred to simply as the "indictment" for ease of reading.

1    that he received $200,000 in kickbacks on school contracts with particular vendor); *see also*

2    *United States v. Rybicki*, 354 F.3d 124, 139-40 (2nd Cir. 2003) (*en banc*), *cert. denied*, 125 S. Ct.

3    32 (2004) (collecting bribery and kickback cases).

4         In the 44-page indictment, the Government accuses the defendants of engaging in acts as

5    city officials.  They are accused, among other things, of failing to disclose conflicts of interest,

6    including their interests in increasing their own city retirement benefits, their interest in

7    maintaining their government positions, and their interests in seeking new employment

8    opportunities, while considering a city proposal known as MP2.

9         The general context is a cash-strapped city government faced with the need to replenish its

10   dwindling pension fund.  Due to a precipitous downturn in the financial markets, the city pension

11   fund was strained.  *Lexin v. Superior Court*,[7] 47 Cal. 4th at 1065.  If the MP1 trigger was hit, the

12   City of San Diego would have been required to make an immediate additional contribution to the

13   pension fund of some amount between $25 and $100 million.  *Id.*  The resulting balloon payment

14   would have seriously hampered the city's ability to deliver services and would have led to layoffs.

15   *Id.* at 1066.  Consequently the city began exploring relief from the trigger, by tying relief to an

16   increase in pension benefits for all city employees.  *Id.*  It was in that political and financial milieu

17   that the defendants committed their alleged crimes.

18        According to the Indictment, the pension fund had a 13-member board of trustees.  Of

19   those 13, nine members were city employees or elected to the board by city employees.  Defendant

20   Saathoff was a board member and a city firefighter and president of the firefighters' union.

21   Indictment, at ¶ 8.  Defendant Lexin was a board member and human resources director for the

22   city.  *Id.* at ¶ 7.  Defendant Webster was a board member and the city's assistant auditor and

23   comptroller.  *Id.* at ¶ 8.  Defendant Grissom was not a board member – he was the administrator of

24   the pension fund.  *Id.* at ¶ 9.  Defendant Chapin was not a member of the board – she was general

25   counsel for the pension fund.  *Id.* at ¶ 10.

26        Beyond these introductory allegations, the indictment becomes at times confusing, vague,

27

28        [7]Lexin, Webster, and Saathoff were among several board members charged with felony state
     conflict of interest violations.

1    and occasionally self-contradictory.  Count One charges the defendants with a conspiracy to

2    "devise a material scheme and artifice to defraud" the board, the members of SDCERS, and the

3    citizens of the city of their right of honest services.  *Id.* at ¶ 26.  The indictment goes on to describe

4    the manners and means of the alleged conspiracy in 10 subparagraphs, and the overt acts in 91

5    additional paragraphs.  Several times it makes reference to other unnamed coconspirators, as in ¶

6    28(q) (a "city official coconspirator"), ¶ 28(rr) ("a coconspirator city official"), ¶ 28(aaa) ("an

7    SDCERS employee coconspirator sent an e-mail to defendants Lexin and Grissom, and

8    another...."), ¶ 28(kkk) ("an SDCERS employee coconspirator"), ¶ 28(bbbb) (same); ¶ 28(ffff)

9    (same), and ¶ 28(hhhh) (same).

10         The manners and means section often describes entirely proper aims and unlikely objects.

11    For example, in the main, the indictment accuses the defendants of fraudulently devising a plan to

12    modify the trigger of MP1 in time to save the city from having to make a multi-million dollar

13    balloon payment to the pension fund.  *Id.* at ¶ 27(a).  However, devising a plan to accomplish the

14    goal of fiscal relief for the city is an entirely proper subject of city administration.  Labeling the

15    plan as fraudulent, as does the indictment, does not suggest criminality.

16         In another example, it is alleged that the defendants devised the plan to lower MP1 so that

17    "they could increase their own personal retirement benefits" and "maintain their positions" and

18    "seek new employment opportunities."  *Id.* at ¶ 27(a).  Even here, there is nothing inherently

19    criminal about wanting to increase one's retirement benefits, maintain one's present position, or

20    seek new employment benefits, yet this allegedly criminal aim is repeated throughout the

21    indictment.

22         Additionally, scheming to increase one's retirement benefits would seem to be an

23    impossible contradiction to allegations in paragraph 1 of the indictment which identifies the city as

24    the entity "responsible for negotiating and granting [retirement] benefits for city employees."

25    Paragraph 14 of the indictment, in the same way identifies the city and the labor unions as having

26    reached agreements granting retirement benefits increases.  Paragraph 12 of the indictment

27    explains that the city was already scheduled to negotiate benefits with the employee unions and

28    that "the four labor unions wanted increased retirement benefits."  In fact, paragraph 16 of the

indictment identifies the City Manager's Office as the source of MP2 – the proposal to reduce the MP1 trigger.  This makes sense – in contrast to the allegation that the five defendants were the source of the proposal, as alleged in paragraph 27(a).  Paragraph 27(c) captures the confusion with this oft-repeated, circular description of the alleged conspiracy: the defendants "agreed to accept increased retirement benefits...in exchange for their support of a proposal to modify MP1 ... so they could increase their own personal retirement benefits."

The indictment next presents a long and detailed "overt acts" section.  It is fair to say that in this part of the indictment, numerous acts are alleged which are not criminal on their face and do not by themselves suggest criminality.

The indictment then sets out in Counts 2 through 5 allegations of honest services wire fraud.  The indictment correctly tracks the language of § 1346.  *Id.* at ¶ 30.  The details, however, are sometimes puzzling.  Repeating an earlier line of thought, the indictment accuses the defendants of "fraudulently devising a plan to modify MP1.  *Id.* at ¶ 31(a).  And once again, it is alleged that the defendants fraudulently agreed to obtain the firefighters' presidential leave benefit for Saathoff in exchange for his support of a proposal to modify MP1.  *Id.* at ¶ 31(b).  Finally, it is alleged as before that the defendants agreed to accept increased retirement benefits in exchange for their support of MP2.  *Id.* at ¶ 31(c).

According to the indictment, the wire fraud was carried out by sending four e-mails: one titled "Fwd: Report;" one titled "City's proposal re SDCERS;" one titled "Re: He's Baaack!;" and one titled "Resolution for Incumbent Presidential Retirement Benefits."  The contents of the e-mails are not described and their place in the execution of the scheme is not described.

Counts six through twenty set out allegations of honest services mail fraud.  As before, the indictment tracks §1346.  There are few new details.  The indictment reincorporates paragraphs one through 24, and 31.  The honest services mail fraud is based upon the "mailing" of four groups of documents to other pension fund board members.[8]  Counts six, seven, and eight are based upon

---

[8]Most of the "mailings" alleged in the indictment are local deliveries in intrastate commerce. Through passage of a 1994 amendment to the federal mail fraud statute, Congress expanded the reach of §1341 to reach mailings through private interstate carriers engaged in purely intrastate commerce, in addition to the U.S. Postal Service. *United States v. Gil*, 297 F.3d 93, 100 (2nd Cir. 2002).

06cr43

1   board packets sent to three board members on June 13, 2002.  The contents are not described.

2   Neither the purpose nor the intended effect is stated.  Counts nine, ten, and eleven are likewise

3   board packets sent on July 9, 2002.  As before, neither the contents, nor the purpose, nor the

4   intended effect are described.  Counts 12 through 15 relate only to defendant Saathoff with each

5   count relating to a different check delivered to the pension fund.  The payer on the checks is not

6   identified.  The significance of the checks is not identified.  Counts 16 through 21 are based on

7   more board packets sent on November 7, 2002.  As in the earlier Counts, there is no explanation

8   about why the packets are significant.

9       Counts 21 through 30 allege honest services mail fraud.  Like Counts six through twenty,

10  these final ten counts track the language of § 1346 but offer minimal details.  The indictment re-

11  incorporates subparagraphs 27(a) through 27(k) from the conspiracy allegations.  *Id.* at ¶ 38.  Each

12  additional Count is based upon one additional board packet delivery.  Curiously, Counts 21

13  through 25 relate to packets dated November 14, 2003 (a year after the passage of MP2), while

14  Counts 26 through 30 related to packets dated December 11, 2003 (also a year after the passage of

15  MP2).  *Id.* at ¶ 39.  The contents are never described.  Neither the purpose nor the intended effect

16  is ever described.

### V.  DEPRIVING ANOTHER OF HONEST SERVICES

18       The charging statute says simply, "[f]or the purposes of this chapter, the term 'scheme or

19  artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest

20  services."  Title 18 U.S.C. § 1346.  "Honest services" is not defined.

21       The federal crime theory of depriving another of "honest services" has a checkered past.  It

22  has been described in great detail in other cases and deserves some mention here.  In the years

23  preceding 1987, federal prosecutors had developed a theory of "honest services" fraud implicit in

24  the mail and wire fraud statutes.  In that year, the Supreme Court considered whether the mail and

25  wire fraud statutes could be read to include a crime of "honest services" fraud.  *McNally v. United*

26  *States*, 483 U.S. 350 (1987).

27       The Court was specifically concerned with the vagueness of the charge, noting, "before

28  one can be punished, it must be shown that his case is plainly within the statute."  *Id.* at 360.  No

1   doubt disappointing prosecutors, the Court refused to read the fraud statutes as including an

2   "honest services" fraud theory because of its potentially unbridled reach – reach that could touch

3   on the function of local government.  "Rather than construe the statute in a manner that leaves its

4   outer boundaries ambiguous and involves the Federal Government in setting standards of

5   disclosure and good government for local and state officials, we read § 1341 as limited in scope."

6   *Id.*  The Court ruled that Congress would have to "speak more clearly" if it desired to criminalize

7   "honest services" fraud.  *Id.*

8          In 1988, Congress enacted § 1346.  Congress spoke, but whether it spoke clearly enough is

9   debatable.  *Compare United States v. Weyhrauch*, 548 F.3d 1237, 1243 (9th Cir. 2008) ("Congress

10  in 1988 chose to 'speak more clearly' by enacting 18 U.S.C. § 1346."), with *Sorich v. United*

11  *States*, 129 S.Ct. 1308 (2009) (Scalia, J., dissenting from denial of certiorari) ("Whether that terse

12  amendment qualifies as speaking 'more clearly' or in any way lessens the vagueness and

13  federalism concerns that produced this Court's decision in *McNally* is another matter.").

14         Because Congress did not define "honest services" there has been disagreement among the

15  courts over what constitutes the crime.  *Weyhrauch*, 548 F.3d at 1243.  The Ninth Circuit has

16  observed, "[t]he 'intangible rights' theory of honest services fraud ... *continues to cause*

17  *controversy despite (or perhaps because of ) Congress's statutory abrogation of McNally*."

18  *Kincaid-Chauncey*, 556 F.3d at 939-40 (citations omitted) (emphasis added); *United States v.*

19  *Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008) ("The central problem is that the concept of 'honest

20  services' is vague and undefined by the statute.  So, as one moves beyond core misconduct

21  covered by the statute (*e.g.*, taking a bribe for a legislative vote), difficult questions arise giving

22  coherent content to the phrase through judicial glosses.").  Justice Scalia echos the observation:

23  "Courts of Appeals have spent two decades attempting to cabin the breadth of § 1346 through a

24  variety of limiting principles.  No consensus has emerged.... Courts have expressed frustration at

25  the lack of any simple formula specific enough to give clear cut answers to borderline problems."

26  *Sorich*, 129 S. Ct. at 1309 (Scalia, J., dissenting).  In an attempt to find definition, courts in the

27  Ninth Circuit look to both pre-*McNally* and post-*McNally* cases.  *See Weyhrauch,* 548 F.3d at

28  1243.

*Weyhrauch* noticed that Ninth Circuit pre-*McNally* cases recognized two core categories of conduct by public officials that may define an honest services crime: "(1) taking a bribe or otherwise being paid for a decision while purporting to be exercising independent discretion and (2) nondisclosure of material information." *Id.* at 1247 (citations omitted). *Weyhrauch*'s survey of post-*McNally* cases from other circuits have generally fallen into one of those two categories. *Id.* (citing *Urciuoli*, 513 F.3d at 295 n. 3) ("Typical post *McNally* cases involve votes paid for by bribes or based on private undisclosed financial interests of the legislator, awarding of contracts based on bribes, and the filing of false financial disclosure forms or other non-disclosures in relation to official duties."). Consequently, *Weyhrauch* held that "conduct on par with bribery and nondisclosure of material information lies at the heart of public honest services fraud." *Id.*

*Kincaid-Chauncey* highlights the need to define the crime with appropriate limiting principles. "The greatest source of controversy, 'given the amorphous and open-ended nature of § 1346,' has arisen over 'the need to find limiting principles' to cabin the broad scope of §1346." 556 F.3d at 940 (quoting *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008)). In what could aptly be a description of the present case, *Kincaid-Chauncey* cautions, "without some kind of limiting principle, honest services wire fraud could potentially make relatively innocuous conduct subject to criminal sanctions." *Id.*

*Kincaid-Chauncey* clarifies § 1346 in two important respects. It holds that for the bribery theory of honest services fraud, evidence of a *quid pro quo* is required to prove the crime. *Id.* at 940. However, none of the five defendants in this case are accused of taking a bribe. For the crime of failing to disclose a conflict of interest, the additional essential element necessary for "honest services" fraud is a scheme to defraud. "There must be a recognizable scheme formed with intent to defraud." *Id.* at 941 (citations omitted). The scheme to defraud, in turn, must include "an affirmative, material misrepresentation." *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010) (quoting *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986)).

To summarize, courts have recognized two principal theories of honest services fraud in cases involving public officials: (1) a public official's acceptance of a bribe; and (2) a public official's failure to disclose a material conflict of interest. *Kincaid-Chauncey,* 556 F.3d at 942.

1   The bribery theory requires a *quid pro quo*.  *Id.* at 943 (citations omitted).  The undisclosed

2   conflict of interest theory does not require a *quid pro quo*.  It does require a conflict that is

3   undisclosed and  a specific intent to defraud.  *Id.* at 944.  In the case of these defendants, the

4   Government has accused them of the second type of crime: a public official's failure to disclose a

5   material conflict of interest.  The elements then are: (a) a conflict of interest; (b) that is

6   undisclosed; (c) that is material; and (d) a specific intent to defraud.

7                           **VI.  REASONS FOR DISMISSING INDICTMENT**

8           A federal indictment is to be read in its entirety, using common sense and including

9   necessarily implied facts.  *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007).  Having

10  considered the charges in light of the California Supreme Court holding in *Lexin v. Superior*

11  *Court*, and the Ninth Circuit's decisions in *Weyhrauch* and *Kincaid-Chauncey*, this Court

12  concludes that the honest services statute, for this peculiar context with these particular facts, is

13  unconstitutionally vague as applied to these five Defendants.  The core factual scenario as alleged

14  in this indictment concerns conduct that is not even close to the facts of any other reported judicial

15  decision.  Because the alleged criminal acts here are so far removed from the heartland of

16  dishonest services cases, defendants would be denied their Fifth and Sixth Amendment rights to

17  fair notice should a trial be permitted and their liberty interests be jeopardized.

18          Because of the ambiguity of the honest services statute, and because it criminalizes

19  conduct, the question of the statute's reach should be resolved in favor of lenity.  *Cleveland v.*

20  *United States*, 531 U.S. 12, 25 (2000) (rule of lenity applied as interpretive guide especially

21  appropriate in mail fraud cases).

22          Finally, the indictment itself fails to state an offense against the United States.

23  **A.  Constitutional Standards**

24          The Sixth Amendment to the United States Constitution guarantees to every defendant in a

25  criminal case the right to be informed of the nature and cause of the accusation against him.  "In

26  all criminal prosecutions, the accused shall...be informed of the nature and cause of the

27  accusation."  U.S. Const. amend. VI.; *Calderon v. Prunty*, 59 F.3d 1005, 1009 (9th Cir. 1995)

28  (Sixth Amendment guarantees defendant a fundamental right to be clearly informed of the

charges).  That an accused is entitled to an indictment that contains all of the elements of a crime

also flows, at least in a federal case, from the Fifth Amendment which provides in relevant part,

"[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a

presentment or indictment of a Grand Jury."  U.S. Const. amend. V.; *see also Apprendi v. New*

*Jersey*, 530 U.S. 466, 499-500 (2000) (Thomas, J., concurring) ("In order for an accusation of a

crime ... to be proper under the common law, and thus under the codification of common-law

rights in the Fifth and Sixth Amendments, it must allege all elements of that crime."); 1 *Wharton's*

*Criminal Procedure* 14th Ed., § 5.8 (2008) (proper indictment ensures defendant's Fifth

Amendment right to protections of a grand jury).

According to the United States Supreme Court, the vagueness doctrine is an outgrowth of

the Due Process Clause of the Fifth Amendment.  Under the Due Process Clause, a conviction fails

to comport with due process, "if the statute under which it is obtained fails to provide a person of

ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or

encourages seriously discriminatory enforcement."  *United States v. Williams*, 128 S. Ct. 1830,

1845 (2008) (citations omitted).

In other words, "[a] statute can be impermissibly vague for either of two independent

reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to

understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and

discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v.*

*Morales*, 527 U.S. 41, 56-57 (1999)).  *Grayned v. City of Rockford* tells why:

> It is a basic principle of due process that an enactment is void for vagueness
> if its prohibitions are not clearly defined.  Vague laws offend several important
> values.  First, because we assume that man is free to steer between lawful and
> unlawful conduct, we insist that laws give the person of ordinary intelligence a
> reasonable opportunity to know what is prohibited, so that he may act accordingly.
> Vague laws may trap the innocent by not providing fair warning.  Second, if
> arbitrary and discriminatory enforcement is to be prevented, laws must provide
> explicit standards for those who apply them.  A vague law impermissibly delegates
> basic policy matters to policemen, judges, and juries for resolution on an ad hoc and
> subjective basis, with the attendant dangers of arbitrary and discriminatory
> application.

408 U.S. 104, 108-09 (1972) (citations omitted); *see also United States v. Lanier*, 520 U.S. 259,

266 (1997) (quoting *Connally*) (there are three manifestations of the fair warning requirement for

1  criminal statutes: (1) the vagueness doctrine; (2) the rule of lenity; and (3) the disallowing of novel

2  constructions).

3  **B.  Vagueness**

4        From reviewing the indictment and holding hearings over the past three years, it is clear

5  that the vagueness of § 1346 has failed to give these defendants fair warning that their conduct

6  could violate the federal mail and wire fraud statutes.  Although the honest services statute is not

7  unconstitutionally vague on its face according to current circuit precedent,[9] it is vague *as applied*

8  to these defendants.

9        One overarching problem which results from § 1346's vagueness is that while acting with

10  an undisclosed conflict of interest may violate the statute, the defendants appear to have had no

11  conflict of interest under state law, so that the defendants and the jury will be left guessing as to

12  what the illegal conflict is, where the duty to disclose flows from and to, and whether the conflict

13  would have been material.

14        The California Supreme Court has held that the state legislature intends pension fund board

15  trustees to share interests with their memberships.  *Lexin v. Superior Court*, 47 Cal. 4th at 1096.

16  Describing the arrangement as "an understandable choice," the purpose is to secure a board that is

17  objective, fair, and competent by including representation from all of the interests involved within

18  a public servant retirement system.  *Id.*  The City of San Diego is not alone in having such an

19  arrangement.  The state court notes that "[m]ember trustees have long been a standard feature of

20  the composition of most public retirement system boards."  *Id.* & n. 24.  Moreover, one expert

21  argues that the arrangement may have financial benefits for the funds because the member

22  trustees' interests are aligned with the performance of the funds they oversee.  *Id.*  The California

23  Supreme Court acknowledges that having "necessarily interested trustees on a governing board

24  poses a dilemma" if one tries to reconcile the "beneficial arrangement" with general conflict of

25  interest prohibitions.  *Id.* at 1097.  However, the dilemma is resolved under state law, as the

26  legislature did not intend to expose "every employee trustee who fulfilled his or her board's

27  duties" to conflict of interest liability.  *Id.* at 1098.

28

---

[9]*United States v. Inzunza*, 580 F.3d 894, 906 (9th Cir. 2009) (§1346 not facially vague).

06cr43

The indictment is founded upon a different conclusion.  The indictment presumes that the built-in conflicts of interest are criminal, notwithstanding California's laws and regulations controlling the conduct of its public officials.  The indictment equates a municipal pension fund board trustee who votes on proposals improving his retirement benefits with depriving the public of its right to honest services.  Of course, the text of § 1346 says nothing at all about conflicts of interest, much less what constitutes a state or local retirement board member's illegal conflict of interest.  Thus, the vagueness of the statute, because it lacks "reference to some external disclosure standard, ... could well impose criminal liability on activity that offends some people's subjective sense of impermissible private entanglement, but may appear to others not to involve any conflict of interest."  *Kincaid-Chauncey*, 556 F.3d at 948 (Berzon, J., concurring).  This is precisely the trap laid for board members here.

Moreover, even assuming for the moment that the defendants did have a conflict of interest under federal law, it is not simply having the conflict that is unlawful.  Instead, it is having a conflict and failing to disclose the conflict that is illegal.  Here, even a casual observer can see the conflict inherent in asking a city employee to vote on a proposal tied to improving future city retirement benefits.  So, what is the conflict for these defendants to disclose?  Surely, other members of the board at SDCERS already knew which members were city employees and would benefit from an increase in city retirement benefits.  Did the defendants have to disclose the fact that they were city employees wearing board member hats?  Did they have to make the same disclosure at every meeting of the board?  "Is it sufficient that a public official note the conflict at the time of the vote?  In advance?  Must the conflict be well publicized, or will a notation in an obscure public record suffice?"  *Id.* at 949.  It is not evident from §1346 or the indictment where the Defendants crossed over the federal line into criminal conduct.

Where a criminal statute is so vague as to preclude fair notice, the rule of lenity may be invoked.  The honest services fraud statute mentions nothing about undisclosed conflicts of interest.  It does not define "honest services" in any way.  Because due process requires fair notice of what is and is not criminal, and § 1346 does not provide that notice for local public officials engaged in voting on local policy issues, the rule of lenity is necessary.  "The rule of lenity, which

1    requires that ambiguities in criminal statutes be resolved against the government, 'serves to ensure

2    both that there is fair warning of the boundaries of criminal conduct and that legislatures, not

3    courts, define criminal liability.'" *United States v. Panarella*, 277 F.3d 678, 697-98 (3rd Cir.

4    2002) (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990)).  Without the rule of lenity in

5    this case, it would be up to a jury to decide what conduct should be a crime, as well as who is

6    guilty.  The rule of lenity requires the ambiguities in the honest services fraud statute be resolved

7    against the government and the conflicts of interest alleged be deemed beyond the reach of the

8    federal government.

9         Finally, because §1346's reach is vague, one is forced to turn to past court decisions to

10   glean insight into what conduct might be criminal.  The problem evident here is that even if one

11   researches pre-*McNally* and post-*McNally* decisions for paradigmatic cases or outliers, there is

12   nothing similar to the kind of charges brought here.  Due process does not permit a defendant to be

13   tried under a novel construction of a criminal statute in a case where "neither the statute nor any

14   prior judicial decision has fairly disclosed" the charged conduct to be within its scope.  *Lanier*,

15   520 U.S. at 266 (citations omitted).  Therefore, because of the novelty of bringing a dishonest

16   services charge against municipal officials for considering and voting on municipal proposals

17   initiated by their city employer, and because of the vagueness of the text of the statute and the fact

18   that it is a criminal statute which fails to give fair warning, this Court finds that the mail and wire

19   fraud statutes are void for vagueness *as applied* to these defendants, and the motions to dismiss are

20   granted.

21   **C.  Failure to State an Offense**

22        Even if the statutes were not found to be void for vagueness, as applied, the indictment

23   would still require dismissal for failing to state and offense against the United States.  "An

24   indictment must set forth each element of the crime that it charges." *Almendarez-Torres v. United*

25   *States*, 523 U.S. 224, 228 (1998).  In this case, the elements of the dishonest services offense being

26   charged are: (a) a conflict of interest; (b) that is undisclosed; (c) that is material; and (d) a specific

27   intent to defraud (including an affirmative, material misrepresentation).  Since defendant Saathoff

28   presents the more difficult question, the discussion begins with him.  Due to the vagueness

1  problem with the honest services fraud statute, a valid indictment must add more specific

2  allegations to give defendants fair warning of the crimes with which they are charged. *United*

3  *States v. Du Bo,* 186 F.3d 1177, 1179 (9th Cir. 1999) (necessary elements not present in the

4  statutory language must be included in an indictment).

5        **1. Conflict of Interest**

6         It is significant that the California Constitution defines the fiduciary duties of pension fund

7  board members. Under the state constitution, board members have two overriding duties. Board

8  members are charged with acting, first, exclusively in the best interests of beneficiaries of the

9  retirement system. This duty takes precedence over all others. Second, board members have a

10  duty to minimize city contributions to its pension fund. The state constitution provides:

11           The members of the retirement board of a public pension or retirement
         system shall discharge their duties with respect to the system solely in the interest

12           of, and for the exclusive purposes of providing benefits to, participants and their
         beneficiaries, minimizing employer contributions thereto, and defraying reasonable

13           expenses of administering the system. A retirement board's duty to its participants
         and their beneficiaries shall take precedence over any other duty.

14
15  Article XVI, section 17, subdivision (b). These two mandatory duties are important to keep in

16  mind when evaluating the charge that defendants acted feloniously in agreeing to vote as they did

17  on MP2.

18         Saathoff voted as a pension fund board member to approve the version of MP2 that he had

19  proposed to the board. It is alleged that he included in his version of MP2 the presidential leave

20  benefit which would increase his own future retirement benefit payout. It is alleged that in so

21  doing, Saathoff delivered criminally dishonest services because he did not disclose a material

22  conflict of interest.

23         Yet, conflicts of interest are built into the structure of a California pension fund board. As

24  a member of the board, Saathoff represented city fire department employees. The firefighters

25  union was one of four major unions covering city employees. Although the indictment does not

26  mention it, two other union heads had already received the same presidential leave benefit. The

27  police employees union president had received the benefit in 1989, and the Municipal Employees

28  Association president in 1997. *Lexin v. Superior Court*, 47 Cal. 4th at 1066. It is fair to say that

Saathoff's pursuit of parity was not simply an exercise in self-interest, but a demand that was

06cr43

1    necessary to gain important respect for the firefighters union in the push-and-pull world of labor-
2    management relations.

3         Looked at in this way, Saathoff was exercising his position as a pension fund board
4    member to protect the interests of his city firefighters constituency.  Voting as a board member in
5    alignment with one's self-interests as a city employee, because those interests align with the
6    interests of other city employees, satisfies the model of public decisionmaking created by the
7    city's charter and the state's constitution.  Though created by design through state law, is it
8    nevertheless a criminal conflict of interest under federal law?  The text of the honest services
9    statute offers no guidance and other pre and post-*McNally* decisions are off point.

10        Lexin and Webster, as both city employees and board members, may also have voted for
11   approval of MP2 in an exercise of self-interest.  If that was the case, again, the self-interest was a
12   designed-in structural interest aligned with the interests of other city employees.  In hindsight, it is
13   now clear that neither Lexin nor Webster acted in violation of state conflict-of-interest law.  *See*
14   *Lexin* v. Superior Court, 47 Cal. 4th at 1101.  To the extent they were working together with
15   Saathoff, as the indictment alleges, towards the goal of obtaining for him the union presidential
16   leave benefit, they may have been engaged in nothing more sinister than coalition building, in
17   hopes that the more  important elements of MP2 would be passed.

18        Finally, it worth noting that as board members, their duties were first to current and future
19   retirees and second to the city to minimize its contributions.  California Constitution, Article XVI,
20   section 17, subdivision (b).  Approval of MP2 satisfied both of those duties *simultaneously* by
21   increasing the amount of employee retirement benefits while alleviating a temporary city difficulty
22   in making the required pension fund contributions.  "The saving of public employer money is not
23   an illicit purpose if changes in the pension program are accompanied by comparable new
24   advantages to the employee."  *Claypool v. Wilson*, 4 Cal. App. 4th 646, 665 (Cal.Ct.App. 1992).
25   Instead of an illegal conflict of interest, the allegations in the indictment suggest that defendants
26   were satisfying their constitutional fiduciary duties.

27        For Grissom and Chapin as employees of the pension fund entity, it is not clear from the
28   indictment whether their retirement benefits would be affected by the approval of MP2 in the same

1   way as other city employees.  Nor is it clear to whom their duties of honest services were owed.

2   The indictment alleges that Grissom and Chapin owed the board a duty to inform the board if any

3   board member had a conflict of interest.  However, the board was designed by law with at least

4   nine of the thirteen members having a structural conflict of interest by virtue of their interests in

5   receiving city retirement benefits.  Surely, the honest services statute was not meant to criminalize

6   a breach of Grissom's or Chapin's duty to remind the board that nine board members had a

7   conflict of interest as city employees or retirees.  It might make more sense where the allegation is

8   that a normally disinterested outside board member in a particular case had a conflict of interest.

9   But that is not the charge in this case.  It is a fatal defect to allege a conflict of interest where there

10  is state law addressing the subject and the state supreme court has found that the officials did not

11  act with an impermissible conflict.  Such is the case for Lexin and Webster, and by extension for

12  Grissom and Chapin.  For Saathoff, it is, at best, a triable question for the state courts to decide.

13          **2. Disclosure**

14          The indictment alleges that Saathoff did not disclose the inclusion of a presidential leave

15  benefit in his MP2 counterproposal.  Perhaps.  The text of Saathoff's MP2 proposal is not

16  provided.  Certainly, it was not something slipped past the notice of city management.  It was part

17  of the union negotiations between the city and the firefighters union in early 2002.  In May 2002,

18  the city tentatively approved the presidential leave benefit for Saathoff.  *Lexin v. Superior Court*,

19  47 Cal. 4th at 1066, 1076.  In July 2002, Saathoff offered his MP2 counterproposal.  In October

20  2002, "[t]he city council...enacted the incumbent union president benefit without any reference to

21  contingencies or action by the SDCERS board."  *Id.* at 1069.  Therefore, regardless of his

22  motivations, it is clear Saathoff was not acting in secret.  The personal benefit he sought, even if it

23  was strictly a personal benefit, was obviously disclosed to the city and the subject of negotiations

24  with the city.

25          If the crux of the indictment is that Saathoff worked with the other defendants *out of view*

26  of the entire board to obtain the presidential leave benefit already obtained by other union

27  presidents, that would appear to be nothing more than a common exercise in legislative coalition

28  building.  It might even be argued that the effort was disclosed to the president of the pension fund

1    (Grissom), and thereby implicitly disclosed to the entire board.  Additionally, the indictment

2    alleges that Lexin disclosed to the city council ahead of time Saathoff's plan to offer a MP2

3    counterproposal.  Indictment at ¶ 19.

4         *Kincaid-Chauncey* makes clear that it is not a crime under § 1346 when a public official

5    endures or invites efforts to persuade his or her vote.  When people attempt to persuade public

6    officials on the merits or demerits of policy proposals and government action, the actions of both

7    are generally protected by the Petition Clause of the First Amendment.  *Kincaid-Chauncey* notes

8    that our political system works in an atmosphere of political persuasion and such workings are

9    protected by the First Amendment.  When a public official listens to others seeking to influence

10   his vote, it is not a crime, it is democracy at work.  And when he makes no effort to disclose the

11   attempted influence, it does not render the exchange a crime.

12              The political system functions because lobbyists and others are able to
           persuade elected officials of the wisdom or error of policy proposals.  We echo the
13         admonition that "[s]uch endeavors ... are  protected by the right 'to petition the
           Government for a redress of grievances' guaranteed by the First Amendment of the
14         United States Constitution."  Attempts to persuade or mere favoritism, evidenced
           by a public official's willingness to take a lobbyist's telephone call or give a
15         lobbyist greater access to his appointment schedule, are not sufficient to
           demonstrate either the lobbyist's or the public official's intent to deprive the public
16         of honest services.  If proof that an individual attempted to influence a public
           official and that the public official failed to disclose that influence were sufficient
17         to demonstrate a violation of § 1346, every individual who wrote a letter to his
           member of Congress last year (not to mention every member of Congress who
18         received one) risks becoming a federal felon.

19   *Kincaid-Chauncey,* 556 F.3d at 941-42 (citations omitted).  The more basic defect with the

20   indictment is that Lexin, Webster, and Saathoff did not need to disclose their own interests as city

21   employees or union president to the other board members.  Their interests were already open and

22   obvious to all.  As to Grissom and Chapin, it is not at all clear what conflict of interest they

23   possessed that should have been disclosed – or to whom it should have been disclosed.

24        **3.  Materiality**

25         In order for section 1346 to be applied to public official non-disclosure cases, the conflict

26   of interest which, should have been disclosed, must be material.  *Weyhrauch*, 548 F.3d at 1247 &

27   n.8.  Unfortunately, the indictment is unclear as to what conflict of interest each Defendant

28   possessed that was both undisclosed and material.  If the allegation is that the defendants schemed

1   to obtain for Saathoff the presidential leave benefit and that it was the undisclosed conflict, it

2   would not qualify as material.  The city had already provisionally approved Saathoff's union

3   president benefit before MP2 was approved by the pension fund board.  Likewise, the city finally

4   approved Saathoff's union president benefit without waiting for MP2' s final approval.

5          Moreover, the other members of the pension fund board would likely have voted to

6   approve MP2 anyhow, considering the low value of Saathoff's benefit as contrasted against the

7   25-100 million dollar liability immediately facing the city and the broad future pension benefits its

8   members would receive.  Put differently, it is unlikely that any of the board members would have

9   voted against MP2 simply to save the city the cost of Saathoff's union benefit.  To do so would

10  have meant forcing the struggling city to pay millions of dollars into the fund and face vast

11  cutbacks in services or possible municipal bankruptcy.  Likewise, it is unlikely that the other board

12  members who wore both pension fund board hats and city employee hats would have voted against

13  the pension fund increases for all city employees, only to make sure that Saathoff would not

14  receive the presidential benefit.  In any event, the indictment does not clearly allege how a conflict

15  was material.  Placed in its historical fiscal context, any plan or scheme to obtain for Saathoff the

16  presidential leave benefit was immaterial.  While an indictment need not allege the materiality of a

17  false representation if the facts warrant the inference of materiality, (*Berger*, 473 F.3d at 1103),

18  here the inference of materiality is missing and fatal to the indictment.

19          **4.  Specific Intent to Defraud**

20          The honest services offense also requires a specific intent to defraud which may be shown

21  by an affirmative, material misrepresentation.  While the indictment does allege that the

22  defendants specifically devised a scheme to defraud, it is missing examples of affirmative, material

23  misrepresentations.  An indictment must also allege an intent to deceive.  But those allegations are

24  hard to find.  An allegation of private gain could qualify for the necessary deceptive intent.

25  *Inzunza*, 580 F.3d 894.  But the indictment does not allege private gain in any immediate sense.

26  Private gain which would inure to these defendants is contingent and distant, depending on each

27  person's future city retirement eligibility and the fiscal health of the pension fund.  The indictment

28  also contains allegations of deceit, but little in the way of allegations of harm.

1       The long and complex superceding indictment covers a lot of ground.  In so doing,

2  however, it fails to allege the essential elements of "honest services" fraud as the crime is currently

3  construed in this circuit.  Consequently, the motions to dismiss the indictment may also be granted

4  for failing to state all of the essential elements of an offense.

5                                   **VII.  CONCLUSION**

6       The statute is vague as applied to these defendants.  There have been many decisions

7  attempting to understand and apply the honest services provision of § 1346.  Throughout the

8  course of these proceedings, this Court has questioned the application of § 1346 to these

9  defendants.  Those concerns have been largely vindicated by the California Supreme Court in

10  *Lexin v. Superior Court* (47 Cal. 4th 1050).  The crime which is alleged in the indictment is not the

11  typical dishonest services scenario, such as the bribing of a public official or extortion by a public

12  officeholder.  Neither is this case the typical undisclosed conflict of interest scenario, such as when

13  a public official directs a government contract to a private business in which the official has a

14  significant financial interest.

15       Far from these typical cases, which make up the heartland of honest services fraud cases, is

16  the case against these five municipal defendants.  The defendants in this case were placed in

17  positions on a public pension fund board, with built-in lawful conflicts of interest, and forced by

18  their city employer to deal with city problems not of their own making.  The city designed a short-

19  sighted political solution and forced the pension fund board to vote.  Had the board voted down the

20  MP2 solution, it might have bankrupted the city.  It might have meant that the city would have had

21  to stop making any amount of payments into the pension fund.  It certainly would have meant

22  being held up to public scrutiny and criticism.  On the other hand, voting to approve MP2 may

23  have been the only way to fulfil their fiduciary duties.  Faced with the unavoidable position in

24  which they had been placed by the city, (*i.e.*, having to consider the city's proposal), one could

25  reasonably argue that approving MP2 was the best way to carry out their twin constitutional duties

26  as board trustees: the defendants maximized benefits for current and future members of the

27  pension fund and minimized contributions from the city contributor.  The legal question now

28  before this Court is, "how could a person of average intelligence reasonably understand that in so

acting, he or she was committing the federal crimes of 'honest services' mail and wire fraud?"

1        In "examining a statute for vagueness, we must determine whether a person of average

2   intelligence would reasonably understand that the charged crime is proscribed.  The statute must

3   be examined in the light of the facts of the case at hand."  *United States v. Williams*, 441 F.3d 716,

4   724 (9th Cir. 2006) (citations and internal quotations omitted).  This Court concludes that as

5   applied to these five defendants, the mail and wire honest services fraud statute is

6   unconstitutionally vague.

7        That which the indictment alleges to be a failure to deliver honest services, has not

8   heretofore been prosecuted as such.  The indictment reflects a reach to the outer limits of federal

9   criminal authority.  Because it requires exploration of the outer limits of the honest services

10  statute, the defendants have not received fair notice of the potential criminality of their alleged

11  actions.  In 2002, the time of the events, the defendants may very well have believed their actions

12  perfectly legal.  State constitution and city charter provisions put Saathoff in the position of having

13  multiple hats to wear.  Rather than a punishable defect, state and city law deems this form of

14  "interested decisionmaking" as preferable.  Of course, it is now known that, at least for Webster

15  and Lexin, their actions did not violate state conflict of interest laws.  *See Lexin v. Superior Court*,

16  47 Cal. 4th 1050.  While the California Supreme Court was not so clear with regard to Saathoff, it

17  was certainly anything but clear in 2002.  The state supreme court described its recent inquiry in

18  various terms acknowledging the serious questions that persisted.  It described the applicable state

19  statute as "no model of clarity" and dealt with the application of "the exception to the exception"

20  while "sailing in largely uncharted waters."  *Id.* at 1079-80, 1086.

21       Of course, under current circuit jurisprudence, one need not violate state law to be guilty of

22  honest services fraud.  *See e.g., United States v. Green*, 592 F.3d 1057 (9th Cir. 2010) ("[W]e

23  believe it is settled that wire fraud does not require proof that the defendant's conduct violated a

24  separate law or regulation, be it federal or state law.").  However, a well-defined external conflict-

25  of-interest standard for this type of case cannot be found anywhere.  There is no satisfactory

26  standard here other than state law against which to measure defendants' innocence or guilt.

27  Measured against state law, four defendants acted properly, and as to the fifth defendant state law

28  was not clear until very recently.

         Moreover, permitting this prosecution to go forward would be to countenance an expansion

06cr43

1   of federal criminal jurisdiction in the absence of a clear statement by Congress, which the Supreme

2   Court resisted in *McNally* and *Cleveland*.  Without Congress conveying its purposes clearly in

3   section 1346, it will not be deemed to have significantly changed the fragile federal-state balance

4   in prosecuting crimes.  *Cleveland*, 531 U.S. at 25.  Because of the absence of a clear statement by

5   Congress, the mail and wire fraud statutes are not to be read "to place under federal

6   superintendence" the vast array of conduct involved in municipal governance and traditionally

7   policed by the State.  *Id.*  A prosecution is now proceeding against Saathoff while the prosecutions

8   of Webster and Lexin have been stopped in the state courts.  In the absence of mainline cases of

9   honest services fraud (bribery, kickbacks, extortion) not prosecuted by local officials, federal

10  prosecutions create unnecessary federal-state friction and the potential for federal overreaching.

11  Absent clear standards, federal courts should allow states and cities decide how they want their

12  public officials to conduct themselves and decide whether to prosecute violations.

13          Fortunately, due process forbids turning citizens into criminals through the application of

14  novel, untested applications of a criminal statute.  *Lanier*, 520 U.S. at 266.  In this case, the

15  defendants have been charged under a novel, untested, application of the vague mail and wire

16  fraud honest services statutes for carrying out pension fund business.  A reasonable person of

17  ordinary intelligence would not have known that what the defendants were doing violated the

18  federal mail and wire fraud statutes.  Under our Constitution, people are not to be punished for

19  "violating an unknowable something."  *Screws v. United States*, 325 U.S. 91, 105 (1941).

20          The indictment is dismissed as to all defendants.

21          IT IS SO ORDERED.

22  DATED:  April 6, 2010

23                                                          _____

24                                                          Hon. Roger T. Benitez
                                                            United States District Judge

25

26

27

28

- 28 -                                                                                      06cr43